UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RODNEY HARRIS,

    Plaintiff,

v.

CITY OF CHICAGO, JOHN COLLINS,
ELBIN REYES, and BRIAN SEXTON,

    Defendants.

No. 15 CV 3859

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Rodney Harris alleges that two City of Chicago police officers and an Assistant State's Attorney engaged in unconstitutional investigation tactics, causing Harris to confess to a crime he did not commit. Defendants move for summary judgment. There are factual disputes that preclude a judgment on the merits as a matter of law, but Harris's suit was filed too late and Sexton is immune from liability. For these reasons, the motions for summary judgment are granted.

**I.    Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See King v. Ford Motor Co.*, 872 F.3d 833, 837 (7th Cir. 2017).

## II. Background

In 2001, defendants John Collins and Elbin Reyes worked for the City of Chicago Police Department. [99] ¶¶ 2–3.[1] Collins worked as a youth officer and investigator and Reyes was a youth investigator and detective. *Id*. Defendant Brian Sexton was an Assistant State's Attorney with the Cook County State's Attorney's Office. *Id*. ¶ 5.

Plaintiff Rodney Harris, who was 15 years old at the time, was staying with Tamika King, a family friend and girlfriend of his cousin, Roy Harris. *Id*. ¶ 12; [108] ¶¶ 1–2. Tamika and Roy's three children—two girls, 3 and 5 years old, and one boy—were also living in the house. [99] ¶ 12. On June 14, 2001, at 11:45 p.m., two Chicago patrol officers encountered Rodney Harris while responding to a nearby domestic disturbance. *Id*. ¶ 13. Harris told them that his cousin, Roy, had chased

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' LR 56.1 statement of facts [99] and defendants' response to plaintiff's LR 56.1 statement of additional facts [108], where the asserted fact and accompanying response are set forth in the same document. Any document previously filed under seal and referenced in this opinion shall be unsealed; by March 6, 2018, the parties shall file a joint statement identifying the docket entries for unsealing or stating a basis for continued secrecy. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret on appeal."). If any filing remains under seal, the filer of the document must file a public version of the document with appropriate redactions.

2

him from the house and threatened to kill him. *Id*. The officers then took Harris to the house, where Roy approached the squad car and told them he wanted Harris arrested because he had discovered him lying naked on top of Roy's three-year-old daughter, who was wearing only underwear. *Id*. ¶ 14. Harris was then taken to the station and placed under arrest. *Id*. ¶ 16. Harris gave the arresting officers the name and phone number for his adoptive mother, and later, after the officers were unable to find his mother, he gave them his grandmother's contact information. *Id*. ¶ 17.

Reyes and Collins' interaction with Harris began a little after 8:00 a.m. the next morning. *Id*. ¶ 6. Collins was primarily responsible for the investigation, and Reyes assisted him. [108] ¶ 5. Reyes and Collins were together with Harris at all times except for brief instances when one of them would step out for a few minutes. *Id*.[2] Neither Reyes nor Collins knew if Harris had eaten, slept, or been Mirandized prior to their contact with him. *Id*. ¶ 10. Otherwise, the parties dispute much of what happened during this time. Reyes and Collins claim that they read Harris his *Miranda* rights, *id*. ¶ 9, but Harris says they did not. [108] ¶ 32; [101-2] at 44:11–13, 49:20–22. Harris claims that Reyes yelled at him, promised that he could go home if he admitted that he abused the victims, and gave him details of what to say to go home—details that Harris spent several hours memorizing. [87-5] at 123:1–13,

---

[2] Harris testified that he was interrogated in a room with Reyes alone. [87-5] at 125:3–6, 135:10–12. However, Collins and Reyes admit that they were together when Reyes interviewed Harris. [108] ¶ 6. At this stage, facts are viewed in the light most favorable to the nonmoving party. Here, that is Collins and Reyes' version—that they were both present for the interrogation, because that would support an inference of Collins's personal involvement throughout the interrogation.

3

134:5–16; [99] ¶¶ 18–19; [108] ¶¶ 7–8. Harris further alleges that after ten hours of maintaining his innocence, a Hispanic, plainclothes officer (presumably Reyes, though Harris was unsure of the officer's name), came into the room telling Harris, "that's not what happened" and "that's not what the doctors are saying," threw a notebook off the table and said, "that ain't what the f'ing doctors are saying, you better tell me." [108] ¶ 7; [101-1] at 122:11–123:16. At that point, Harris started crying. [108] ¶ 7. The defendants dispute Harris's account, and the defendant officers deny having told Harris that things would be easier if he cooperated. *Id.* The defendant officers also maintain that Harris confessed to them, though he "sugar-coated" what he had done. [108] ¶¶ 9, 13.

Collins and Reyes next spoke with Harris and his grandmother, before calling the State's Attorney's Felony Review Unit. [99] ¶ 23. Sexton was filling in for a team supervisor in the Felony Review Unit. [99] ¶ 21. Attorneys assigned to the Felony Review Unit "evaluate whatever evidence the police ha[ve] gathered and decide whether to file felony charges or not" and "assist the police in their investigations."[3] [87-10] at 9:12–16; [101-2] at 94:19–24. Collins told Sexton that Harris had admitted to being caught by Roy sexually abusing his two daughters. [99] ¶ 27.[4] Before speaking with Harris, Sexton reviewed the General Offense Case Report, which was complete aside from Sexton's approval of the charges. *Id.* ¶ 28. The Case Report stated that a medical examination demonstrated that the victim's

---

[3] Sexton also testified that his role did not include assisting the police with their investigation. [87-10] at 9:17–19.

[4] Any facts not properly controverted by reference to admissible evidence are deemed admitted. *See* LR 56.1.

injuries were consistent with the allegations. *Id.* ¶ 59; [87-8]. When Sexton arrived at the police station around 3:00 p.m. on June 15, he, Collins, Reyes, Harris, and Harris's grandmother were all in the youth office, which was an open area with three desks. [99] ¶ 21, 26. Sexton sat next to Harris at one of the desks. *Id.* ¶ 29. The parties dispute whether Sexton made clear that he was not Harris's attorney, [99] ¶ 30, and whether Sexton read Harris his *Miranda* rights. *Id.* ¶¶ 30–31. Harris maintains that either Collins or Reyes had previously told him that "[his] lawyer, the lawyer for the people was on his way." [108] ¶ 16. The officers deny saying this. *Id.* The parties also dispute whether Reyes was present when Sexton spoke with Harris. [99] ¶ 49. Harris says he was, *id.*, Reyes admits he was at the station at the time, but he is unsure whether he was there for the interview, and Sexton says that Reyes was not there. [87-10] at 39:1–9; [101-4] at 22:11–22, 30:6–17. At one point, Sexton asked the defendant officers to leave so he could ensure they had not mistreated Harris. [108] ¶ 18. If he had determined Harris had been mistreated, Sexton would have stopped speaking with him and notified his supervisors. *Id.*

Sometime thereafter, Collins returned. *See id.* ¶ 26. Harris says that he lied to Sexton and Collins, telling them that he had abused his cousins. [87-5] at 138:21–139:20. Sexton asserts that after an initial conversation with Harris, lasting 20 minutes, Sexton asked Harris if he would be willing to give a handwritten statement, whereby Sexton would write the statement and Harris would have an opportunity to review it. [108] ¶ 19. Defendants say that Sexton read the statement aloud. *Id.* ¶ 26. Harris states that Sexton began writing out the statement without

5

discussing it with him, never read the statement to him, and that he was just told to initial and sign the statement at specific locations. *Id*. ¶¶ 20, 24. Harris signed the statement, though the parties dispute whether he signed the line immediately below the pre-printed *Miranda* warning. [99] ¶¶ 40, 44.[5] Sexton added, and Harris initialed and signed, a paragraph stating that Harris's grandmother had advised him, that Harris acknowledged her statement, and that she would use an X for her signature because she had a pinched nerve in her hand. *Id*. ¶ 41. Harris maintains, however, that though he signed this statement, in reality his grandmother was illiterate and not his legal guardian. [108] ¶ 8; [101-6] at 18:17–24. The signed statement was the same format as a statement Harris had previously signed in connection with an unrelated offense.[6] [99] ¶ 44. After being at the station for approximately two hours, Sexton filled out his felony review folder, notified the detective he approved the charges, and left the station. *Id*. ¶ 47. At no point while he was with Sexton was Harris handcuffed, chained, or shackled. *Id*. ¶ 29.

The parties dispute when Harris ate during the course of these events. Collins testified that Harris received pizza and a soda before they "did anything." [108-4] at 67:2–15. And Sexton said Harris told him he had been given a slice of pizza and a sandwich prior to meeting with Sexton. [108-3] at 14:11–15:24. Harris,

---

[5] The statement is dated June 14, 2001 at 3:30 p.m., but the parties agree that the interview occurred in the afternoon of June 15. *See* [99] ¶ 38.

[6] In September of 2000, Harris was arrested for aggravated criminal sexual abuse against his cousin. [99] ¶ 8. Harris signed an inculpatory statement regarding his involvement in that crime, and Harris admits that statement contained no untrue or incorrect statements. *Id*. ¶ 9.

6

however, asserted that he went ten hours without eating and received food only after he signed the written statement. [101-5] at 86:11–13.

Roy Harris's signature, dated June 15, 2001, appears on a criminal complaint against Harris, on behalf of his daughters, for aggravated criminal sexual assault. [87-14]. However, Collins does not recall having Roy sign the form, and Roy does not recall signing it or whether the complaint was blank at the time that he signed it. [108] ¶ 30, 33; [101-13] at 138:21–139:6. Collins's name was written as the "clerking" officer on the criminal complaints, though he did not sign one of the complaints. [108] ¶ 30. Collins first stated that he had prepared those criminal complaints, but then later testified he was unsure if that was accurate. *Id*. Reyes has no recollection of any conversation he may have had with Roy, nor does he recall hearing Roy recount any details of the incident. *Id*. ¶ 31. Reyes did not prepare the criminal complaints and does not know who did. *Id*. ¶ 32. Due to memory issues caused by strokes and dementia, Roy has no memory of these events. *Id*. ¶ 33; [99] ¶ 70–71.

A University of Chicago Children's Hospital medical record dated June 15, 2001, at 6:00 a.m., (about two hours before Collins and Reyes interacted with Harris) states, "Father (Roy Harris) came home tonight and found his cousin (15yo Rodney Harris) on top of [redacted] 3yo [female] in the two girls' bedroom. Father states Rodney had no clothes on and [redacted] was wearing only her underpants." [99] ¶ 56. While Roy does not recall communicating with University of Chicago hospital staff about Harris's interactions with his daughters, he stated he would

have had no reason to lie. *Id*. ¶¶ 53–54. Another University of Chicago medical record states, "6/15/01 S.W. follow-up note. Area 1 youth, Jack Collins, investigating." [87-17] at 2. Harris's arrest report states, "Dr. Ramaiah of Wyler Children's Hospital reported that victim had small pinpoint hemorrhage to the opening of the vagina, which she stated is consistent with the arrestee's charge." [99] ¶ 60. The General Offense Case Report for Harris's offense, which was drafted and signed by one of the arresting officers, similarly states, "Dr. Ramaiah's examination [of the victim] revealed evidence of a small hemorrhage to the opening of the vagina and that the injury was consistent with the allegations." *Id*. ¶¶ 58–59; [87-8] at 3. Dr. Ramaiah testified that this case would have been reported to the police due to the concern for sexual abuse or assault. [99] ¶ 63.

Neither Reyes nor Collins spoke to, or attempted to speak to, the victims or their mother and do not know if any other member of the police department did either. [108] ¶ 11. Collins never spoke with any doctor that had treated the victims and does not know whether any other officers spoke with any doctors. *Id*. ¶ 12. The parties dispute if and when the officers reviewed and obtained copies of the victims' medical records. *See id*.; [101-4] at 44:1–24; [108-4] at 84:20–85:15.

Based on Sexton's approval and after Harris confessed, he was charged with multiple counts of aggravated criminal sexual assault and aggravated criminal sexual abuse. [99] ¶ 64. On May 10, 2002, Harris pleaded guilty to two counts of aggravated criminal sexual assault. *Id*. ¶ 65. His confession provided the factual

basis for his guilty plea and he was sentenced to fifteen years in prison. [108] ¶ 34–35; [101-19] at 8:12–9:8.

Harris filed a post-conviction petition, and eventually in 2010, the state court vacated his guilty plea and conviction on the basis of ineffective assistance of counsel. [87-21] at 14; *see Harris v. L.C.*, 2012 IL App (1st) 120054 ¶ 6, 2012 WL 6965090, *2 (1st Dist. 2012). The prosecution continued, and in October 2011, Harris's motion to suppress his handwritten and oral statement was granted "based on [his] failure to understand the *Miranda* rights due to his own failings at that particular time." [99] ¶¶ 65–66. After Harris's statements were suppressed, the State's Attorney's Office continued the prosecution against him and he remained subject to the terms of bond. [108] ¶ 36. On May 3, 2013, the victims' mother testified that she no longer wished to pursue the case on behalf of her daughters, and the prosecution dismissed the case. [99] ¶¶ 68–69.

### III. Analysis

Harris brought this suit alleging that all three defendants forced him to falsely incriminate himself in violation of the Fifth Amendment; interrogated him in a manner that shocks the conscience in violation of the Fourteenth Amendment; fabricated evidence resulting in a deprivation of his liberty without due process of law; failed to intervene in each other's constitutional violations; and did all of this in furtherance of a conspiracy. Defendants argue that Harris's claims against them are time barred. Defendants further argue that even if Harris's suit is timely, they are entitled to summary judgment on the merits (aside from defendant Reyes, who

9

admits there is a genuine dispute of fact as to his liability for Harris's self-incrimination claim). Finally, all three defendants assert that qualified immunity shields them from liability, and Sexton argues he is also entitled to absolute immunity.

A. Timeliness

Section 1983 provides a federal cause of action, and federal law sets the date of accrual. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). When a plaintiff brings a § 1983 action for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," the plaintiff must prove that the conviction or sentence has been reversed, expunged, declared invalid, or otherwise called into question. *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). In other words, *Heck* defers the accrual of claims that would impugn an "extant conviction." *Wallace*, 549 U.S. at 393. The *Heck* rule of deferred accrual comes into play only when a conviction or sentence is still outstanding. *See id.*

Because Harris's guilty plea, conviction, and sentence were based on his coerced confession, he could not bring § 1983 claims based on the unlawfulness of that confession until the claims would not question the validity of a conviction. In October 2011, Harris prevailed on his motion to suppress. At that point, the prosecution had 30 days in which to bring an appeal or file a motion to reconsider. *See People v. Holmes*, 235 Ill.2d 59, 61 (2009). From November 2011 on, there was no longer any outstanding conviction or sentence (or even pending prosecution) that Harris's § 1983 claim could have impugned. Because Harris's confession could no

longer be used against him, *Heck* no longer barred him from bringing his § 1983 claim.

The standard rule is that a claim accrues when a plaintiff has "a complete and present cause of action." *Rawlings v. Ray*, 312 U.S. 96, 98 (1941). Harris asserts that defendants coerced his confession, interrogated him in a manner that shocks the conscience, fabricated evidence and his confession, failed to intervene in each other's wrongful acts, and conspired with each other along the way. Each of these claims stems from the same alleged wrongs—that defendants engaged in unlawful and untruthful acts during their investigation and then used that wrongfully obtained evidence in legal proceedings against Harris. Harris had a complete and present cause of action for each of these claims once his confession was used against him to deprive him of his liberty—which occurred when he entered a plea of guilty based on his confession and was sentenced to 15 years in prison. *Heck* deferred that accrual, but once his conviction would no longer have been impugned by claims about the confession and the *Heck* bar was removed, the statute of limitations on these claims began to run. State law governs the length of the statute of limitations, which is two years in Illinois. *Wallace*, 549 U.S. at 388; 735 ILCS § 5/13-202. Harris filed this suit in May 2015, more than two years after the clock began to run on his claims, and so they are time barred.

Harris attempts to avoid this outcome by arguing that when determining the date of accrual of a § 1983 claim, a court should look to state law on the most analogous tort. *See Manuel v. City of Joliet*, 137 S.Ct. 911, 920–21 (2017). According

11

to Harris, the most analogous tort here is malicious prosecution—an element of which is that the criminal proceedings must have terminated in favor of the accused. *See Ghosh v. Roy*, 208 Ill.App.3d 30, 32 (5th Dist. 1991). And because a claim generally does not accrue until the plaintiff has a complete cause of action, a malicious prosecution claim does not accrue prior to the favorable outcome of the proceedings. Harris argues that his claims are akin to malicious prosecution, so they did not accrue until the proceedings ended in his favor—here when charges against him were dropped in May 2013. I disagree. The reason a malicious prosecution claim cannot be brought before the accused has prevailed on his criminal case is that to allow otherwise could lead to inconsistent judgments. *See Heck*, 512 U.S. at 484. The same cannot be said for Harris's claims. As discussed above, once he prevailed on his motion to suppress and the state did not appeal, there was no longer a risk of contradictory outcomes. As such, there is no justification for incorporating this element of malicious prosecution into Harris's due-process based, coerced confession and fabrication of evidence claims and so his suit is dismissed as untimely.[7]

B. **Sexton's Immunity**

"[P]rosecutors are entitled to absolute immunity when they are performing functions—such as determining whether charges should be brought and initiating a prosecution—'intimately associated with the judicial phase of the criminal process.'"

---

[7] All claims against the City of Chicago are also dismissed. Harris never re-plead his *Monell* claim, *see Harris v. City of Chicago*, 15-cv-3859, 2015 WL 5445012 (N.D. Ill. Sept. 15, 2015), and because his claims against the officers are time-barred, the city cannot be liable as an indemnifier.

12

*Lewis v. Mills*, 677 F.3d 324, 330 (7th Cir. 2012) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993)). However, a prosecutor does not enjoy absolute immunity for actions that are investigatory as opposed to prosecutorial. *Buckley,* 509 U.S. at 273 ("There is a difference between an advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand.") Because a prosecutor cannot act as an advocate before there is probable cause, he receives no absolute immunity for his actions before probable cause is established. *Id*. at 274. That said, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards." *Id*. at 274 n. 5.

A prosecutor who is called in to approve or disapprove charges after the accused has been arrested, taken a polygraph test, participated in a lineup, beaten by officers, and given an allegedly coerced confession is acting as a prosecutor and enjoys absolute immunity. *Hunt v. Jaglowski*, 926 F.2d 689, 693 (7th Cir. 1991). In *Hunt*, the prosecutor's duty was to approve or disapprove the charges the police were seeking based on evidence the officers had already gathered. *Id*. That the prosecutor in *Hunt* "questioned plaintiff himself to verify the confession obtained by the police before making his own decision whether or not to file charges" did not turn the prosecutor into an investigator. *Id*. (quoting *Boyd v. Village of Wheeling*, 83 C 4768, 1985 WL 2564 (N.D.Ill., Sept. 12, 1985)).

13

Irrespective of Collins and Reyes' subsequent actions, the arresting officers had probable cause to arrest Harris after Roy told them he had witnessed Harris abusing a child. Sexton's involvement, therefore, took place after probable cause had been established. Though that does not automatically grant him absolute immunity, it cuts in favor of a finding that Sexton's actions were prosecutorial rather than investigatory.

By the time he obtained Harris's written statement, Sexton had read the General Offense Case Report, which relayed Roy's accusations and corroborative results of the victims' medical exam. Even if Harris is correct that Collins and Reyes fabricated the case report, Sexton's role in these events was prosecutorial. Sexton was under the impression that Harris had already admitted his guilt—Collins told him that Harris had confessed to the crime. Though Harris disputes that he had confessed to the officers, he does not dispute that Collins told Sexton he had. *See* [99] ¶ 27. So while Sexton questioned Harris as well, he did so to verify the confession he believed had already taken place and to decide whether to approve charges—both of which are prosecutorial acts. Because his actions were prosecutorial and not investigative, Sexton is entitled to absolute immunity for his involvement.[8]

---

[8] Additionally, Sexton is entitled to qualified immunity for his failure to intervene in the defendant officers' constitutional violations. A government official is entitled to qualified immunity unless there is: (1) a violation of a constitutional right that (2) was clearly established at the time of the defendants' alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). To the extent the cases Harris relies on show that a prosecutor's duty to intervene was clearly established in 2001, *see, e.g., Whitlock v. Brueggmann*, 682 F.3d 567 (7th Cir. 2012); *Saunders v. City of Chicago*, 12-cv-09158, 2013 WL 6009933, *10 (N.D. Ill. Nov. 13, 2013); *Rivera v. Lake County*, 974 F.Supp.2d 1179, 1191 (N.D. Ill. 2013);

## C. The Merits

Assuming Harris's claims were timely, disputes of fact would prevent an entry of summary judgment on the merits as to defendants Collins and Reyes. There is an overarching dispute as to Collins's personal involvement during Reyes's initial interrogation of Harris prior to Sexton's arrival. To prevail on a civil rights action a plaintiff must prove that the defendant personally participated in or caused the unconstitutional actions. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). There are some facts in the record suggesting that Collins was involved throughout the police interrogation, and so a reasonable jury could find that Collins personally participated in the alleged violations.

As to Harris's assertion in Count I, that defendants forced him to falsely incriminate himself in violation of the Fifth and Fourteenth Amendments, the parties dispute whether defendants read Harris his *Miranda* rights. Statements obtained without reading the accused his *Miranda* warnings and later used against him in a criminal case implicate the self-incrimination clause. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1026 (7th Cir. 2006). A reasonable jury could believe Harris's account that he never received *Miranda* warnings prior to admitting his guilt and so the merits of this count cannot be resolved as a matter of law. As to Count II, there are factual disputes about the relevant factors considered

---

*Patrick v. City of Chicago*, 14 C 3658, 2014 WL 7204501, at *10 (N.D. Ill. Dec. 17, 2014); *Chatman v. City of Chicago*, 14 C 2945, 2015 WL 1090965, at *10 (N.D. Ill. Mar. 10, 2015), he fails to identify a case establishing that a prosecutor is liable for failure to intervene when he is acting as a prosecutor. Because Sexton was acting as a prosecutor, and Harris has not shown that a prosecutor's duty to intervene was clearly established at the relevant time, Sexton also has qualified immunity for Harris's failure to intervene claim.

15

to determine whether the defendant officers' behavior shocks the conscience, in violation of the Fourteenth Amendment. Those disputed facts include how long Harris went without food during his interrogation and whether he slept. Viewing these facts in the light most favorable to Harris, given his age at the time and the length of his interrogation, along with the other relevant factors, a jury could conclude that the defendants' interrogation tactics overcame Harris's free will. *See United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). For Count III, a reasonable jury, crediting Harris's account, could conclude that the officers believed they were extracting a false confession, and made up the false confession for Harris to parrot back to Sexton. A police officer who knowingly fabricates evidence against the accused violates due process if that evidence is later used to deprive the accused of his liberty in some way. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

And a jury that found in favor of Harris on any of Counts I–III could also find for him on Count IV (failure to intervene) or Count V (conspiracy). An officer has a duty to intervene to prevent a constitutional violation if he had a realistic opportunity to prevent the harm from occurring. *See Montaño v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008). The parties dispute whether Collins was present at the initial interrogation and whether Reyes was present at the second (when Sexton spoke with Harris). If the jury determined they were present, it could find that each officer had a realistic opportunity to prevent the harm. To prevail on a civil conspiracy claim, a plaintiff must prove (1) an express or implied agreement to

deprive plaintiff of his constitutional rights and (2) actual deprivations of those rights in the form of an overt act in furtherance of that agreement. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). If Harris prevailed on any of Counts 1–3 he would also satisfy the second element to conspiracy. A reasonable jury could infer an agreement based on Harris's allegations that Collins and Reyes were together throughout the investigation, intentionally did not Mirandize him, and engaged in other objectionable behavior to coerce him into falsely confessing.[9]

In sum, if Harris's claims were not time barred, genuine disputes of material fact would prevent an entry of summary judgment on the merits as to defendants Reyes and Collins. But because Harris's complaint is barred by the statute of limitations, and because Sexton is entitled to absolute immunity, the motions for summary judgment are granted.

## IV. Conclusion

Defendants' motions for summary judgment [84] and [88] are granted. Enter judgment and terminate civil case.

ENTER:

                                                                                   _____
                                                                                   Manish S. Shah
                                                                                   United States District Judge

Date: February 13, 2018

---

[9] The officers are not entitled to summary judgment based on qualified immunity. Taking the facts in the light most favorable to Harris, Reyes and Collins violated Harris's constitutional rights by coercing his confession, interrogating him in a manner that violated his due process rights, and fabricating evidence and using it against him. These rights were all clearly established in 2001, when the conduct took place.

17